SAM B. GINSBURG, Et. al., [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Ginsburg v. Commissioner
Docket No. 5693-72, 5694-72, 5695-72, 5696-72, 5697-72, 5698-72.
United States Tax Court
T.C. Memo 1974-191; 1974 Tax Ct. Memo LEXIS 124; 33 T.C.M. (CCH) 814; T.C.M. (RIA) 74191; July 29, 1974, Filed. Sherwin C. Peltin, for the petitioners. John L. Pedrick, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined that Michael Rosen, Sam B. Ginsburg, and Theodore Silberman were liable as transferees in the respective amounts of $129,389.72, $129,462.72, and $64,731.35 for a deficiency in the income tax liability of Highway 67 Development, Inc., for its taxable year ended May 26, 1969, in the amount of $165.284.34. Respondent determined deficiencies in the income tax liability of Sam B. Ginsburg in the amounts of $7,894.42 and $38,025.68 for the calendar years 1968 and 1969, and in the income tax liabilities of Theodore Silberman and Dorothy Silberman in the amounts of $2,054.82 and $13,309.18 for *127 the calendar years 1968 and 1969, and in the income tax liabilities of Michael Rosen and Gail Rosen in the amounts of $4,319.43 and $27,759.76 for the calendar years 1968 and 1969, respectively. These petitioners in an alternative allegation in their petitions claim overpayments in the following amounts for the years indicated: Docket No.
Petitioner
1968
1969
5693-72
Sam B. Ginsburg
$7,583.38
$29,223.68
5697-72
Theodore Silberman and Dorothy Silberman
1,980.13
6,152.06
5698-72
Michael Rosen and Gail Rosen
2,215.10
3,378.60
Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision the following: (1) Whether Highway 67 Development, Inc., held a piece of property which it sold in December 1968 primarily for sale to customers in the ordinary course of its trade or business so as to bring it within the definition of collapsible corporation contained in section 341(b), I.R.C. 1954, [2] thereby causing the provisions of section 337(a) to be inapplicable to the sale because of the limitation as to the applicability of that section contained in section 337(c) (1) (A). *128 (2) If we hold that Highway 67 Development, Inc., is taxable upon the gain on the sale of the property, for which tax Sam B. Ginsburg, Michael Rosen, and Theodore Silberman are liable as transferees, should the amount these transferees reported as capital gains on the distributions they received from the corporation in 1968 and 1969 be reduced by the amount of their transferee liability in determining their income taxes for these years? (3) Whether Michael Rosen sustained a loss from the worthlessness of stock of the Antoine Silver Mines, Ltd., in the calendar year 1969. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of his petitions in this case, Sam B. Ginsburg (Ginsburg) was a resident of Milwaukee, Wisconsin. He filed his Federal income tax returns for the calendar years 1968 and 1969 with the district director of internal revenue in Milwaukee, Wisconsin. Theodore and Dorothy Silberman, husband and wife, were residents of Milwaukee, Wisconsin at the time they filed their petition in this case, and Theodore Silberman (Silberman) was a resident of Milwaukee, Wisconsin at the time he filed his petition as *129 transferee in this case. The Silbermans filed their joint Federal income tax returns for the calendar years 1968 and 1969 with the district director of internal revenue in Milwaukee, Wisconsin. Michael and Gail Rosen, husband and wife, were residents of Bayside, Wisconsin at the time they filed their petition in this case, and Michael Rosen (Rosen) was a resident of Bayside, Wisconsin at the time he filed his petition as transferee in this case. The Rosens filed their joint Federal income tax returns for the calendar years 1968 and 1969 with the district director of internal revenue in Milwaukee, Wisconsin. Highway 67 Development, Inc. (Highway 67) was a Wisconsin corporation, incorporated on May 31, 1968. It had its principal office in Milwaukee, Wisconsin, and filed Federal corporate income tax returns for the period May 13, 1968, through July 31, 1968, and the period August 1, 1968, through May 26, 1969, with the district director of internal revenue in Milwaukee, Wisconsin. Highway 67 was incorporated for the purpose of holding as an investment certain real estate which Rosen and Silberman had contracted to purchase after negotiations and under conditions hereinafter *130 described. It was incorporated at the insistence of Ginsburg who it was agreed would participate in the purchase of the property. It had issued and outstanding during its entire existence 1,000 shares of stock which were issued at $1 per share. Initially, 400 shares were issued to Rosen, 400 to Ginsburg, and 200 to Silberman. On July 19, there was transmitted by counsel for Highway 67 to the district director of internal revenue in Milwaukee, Wisconsin an election under section 1372 by Highway 67 to be taxed as a small business corporation under subchapter S, to which was attached the consent of the three stockholders of the corporation dated July 11, 1968. The three stockholders were the directors of the corporation and its officers, Ginsburg being president, Silberman, vice president, and Rosen, secretary. This transmittal was pursuant to a resolution adopted by Highway 67 at the intial meeting of its board of directors on May 31, 1968, which resolution was adopted after a discussion recorded in the minutes as follows: The Directors then discussed whether the Corporation should elect to be taxed under subchapter S of the Internal Revenue Code. Although the Corporation is *131 not expected to engage in any operations other than holding, as a passive investor, certain investment real estate, it may, at some future date, enter into an active business. While the election would have no significant effect under the present circumstances, change to an active business might create such changed circumstances as would make an election advantageous. Thus, an election would be without current impact, such election might be viewed as extra precaution in case some active business is commenced. It was noted that the Directors were all of the shareholders of the corporation.The Directors determined that an election to file for such taxable status should be made and that the consent of each shareholder should be executed. On August 19, 1968, stock certificate No. 2 for 400 shares issued to Rosen was replaced by stock certificate No. 4 issued for 1 share to Alan Marcuvitz (Marcuvitz), and certificate No. 5 for 399 shares issued to Rosen. Rosen and Silberman in 1965 had acquired property known as the Stevens Farm which they proceeded to develop through a limited partnership, Heritage Heights Development Co. This property was developed in three sections known as *132 the Heritage Heights Subdivision, Heritage Heights Addition No. 1, and Heritage Heights Addition No. 2. The property was subdivided and homes built on the property by another company. Heritage Heights Development Co. (hereinafter Development) was originally composed of Rosen, Silberman, and another individual not in any way connected with this case as general partners and three limited partners. In 1968 Ginsburg joined Rosen and Silberman in the place of the third general partner. Rosen had for some time been engaged in the real estate business, primarily as a developer, although he was also a broker and engaged in other phases of the real estate business. Silberman had been engaged for some period of time in the real estate business and was a real estate broker. Ginsburg was an industrialist engaged primarily in the beverage bottling business. Although Rosen had over the years had interests in a number of partnerships other than Development and in some corporations engaged in real estate development, Development was the only business interest in which Rosen and Silberman had been jointly involved and was the only business in which Ginsburg had been involved with either of *133 them. Neither Rosen, Silberman, nor Ginsburg were engaged in the business of purchasing undeveloped land for resale in an undeveloped state. Stanley J. Potrykus, a professional engineer and land surveyor with Metropolitan Survey Service, was engaged to do the engineering work for Heritage Heights, including sewer, water, road design, and platting. The original plan called for a sewer system which would serve the Heritage Heights subdivision only. The City of Oconomowoc, however, adopted the suggestion of the Board of Public Works and requested that Development install facilities adequate to serve other nearby areas which might eventually be developed as well. Accordingly, at an additional cost of about $8,999.20 paid by the city, Development installed a larger main and a larger sewer lift station which would be able to serve 60 additional acres. Included in the area which would be served was a part of a farm of approximately 152 acres across State Highway 67 from Heritage Heights which belonged to Mr. and Mrs. Gilbert Dopp and a part of another tract known as the Whitman subdivision to the north of the Dopp farm. In 1966, Silberman called Rosen's attention to the potential *134 for increase in value of the Dopp farm which was across Highway 67 from Heritage Heights and they had the land surveyed in order to obtain a legal description. The Dopp farm contained two residences, one occupied by the Dopps and the other rented by them to a family named Ruder for $65 per month. It also contained dairy barns and silos. About 30 percent of the land was being farmed and the rest was fallow. Dopp participated in the soil bank program of the United States Department of Agriculture's Agricultural Stabilization and Conservation Service (hereinafter ASCS) from which he received compensatory payments in the spring and fall of each year. On November 15, 1967, the Dopps entered into an agreement with Rosen and Silberman to grant them an option to purchase the Dopp farm in exchange for $1,000. The agreement was in large part drafted by the Dopps' attorney, and provided for purchase by Rosen and Silberman of the farm no later than June 1, 1968, at $1,100 per acre, including all buildings, with full payment in cash at closing. The option provided that the Dopps would furnish to Rosen and Silberman a topographical map which they had previously had prepared of the property *135 and if the option were exercised would sell the map to Rosen and Silberman for $800. The option provided that the Dopps would have a survey made of the property to determine its exact acreage upon the request of Rosen and Silberman and if the option were not exercised the Dopps would be reimbursed the cost of the survey by Rosen and Silberman. The agreement also provided that Dopp and his wife upon request would at no cost to them join in an action for annexation of the land to the City of Oconomowoc. If the option were exercised, the agreement gave the Dopps the right to select and purchase for $1,100 plus the costs of any improvements a 1-acre lot when and if the farm were subdivided with the following qualifications: (a) It is possible that no portion of this real estate may be zoned for single family residential use. (b) Theodore Silberman and Michael D. Rosen may not plat for single family use for several years. Therefore, there exists the possibility that the aforementioned choice discussed in foregoing paragraphs may not be available to the * * * [Dopps]. If this is so, then Theodore Silberman and Michael D. Rosen have no obligation to provide that choice in this *136 parcel of real estate. As additional consideration, the option gave the Dopps the right to purchase a lot in an area of Heritage Heights at cost, such lot to be selected within 14 days of the making of the option agreement but effective only if the option were exercised. Also by the agreement, the Dopps were given the right to remain on the farm after exercise of the option and pay $75 per month rent, and were to have 60 days' notice to vacate. Silberman and Rosen, however, were expressly relieved from any obligation to repair or maintain the structures thereon. An addendum to the agreement was executed the same day as the option, changing the option granted by (a) reducing the price to $250; (b) providing for payment to the Dopps, on exercise, for their costs of the crop planted, plus a customary amount compensating them for their labor and $500 for anticipated profit; (c) designating the spring 1968 ASCS [3] payment to Dopp and the fall payment to Silberman and Rosen; and (d) making Silberman and Rosen the owners of the growing crop upon closing. On November 29, Gilbert Dopp notified Silberman and Rosen in writing that he elected to purchase Lot 9, Block 2, in Heritage Heights *137 Addition No. 1 if the option were exercised. On March 8, 1968, an attorney retained by Rosen and Silberman filed a petition in the names of Mr. and Mrs. Dopp, as owners, and Paul F. and Jean M. Ruder, as "electors," requesting that the City of Oconomowoc annex the Dopp farm. In accordance with the procedure prescribed by statute, the petition was forwarded to the Department of Local Affairs and Development for review. On March 18, that department notified the attorney that the legal description submitted was defective in that the boundary of the Dopp farm was not shown to be contiguous to Oconomowoc but was separated therefrom by Highway 67 and therefore review of the proposed annexation was being suspended. On April 18 a new petition for annexation was filed in the names of Mr. and Mrs. Dopp and the Ruders. This second petition was identical to the earlier one except that the date was changed, the attached legal description was revised, and the attached map was revised. The revisions in description and the map moved one boundary of the Dopp farm *138 from the right-of-way line of Highway 67 to the center line of the road, thereby making the property contiguous to the City of Oconomowoc. On April 19, Rosen and Silberman submitted a written offer to the Dopps to purchase their farm for $166,353, with a $16,353 downpayment and $150,000 to be paid in equal installments over a 3-year period beginning June 1, 1969, with 6 percent interest on the unpaid balance, pursuant to a land contract attached thereto and labeled Exhibit "B." The attached land contract provided that the purchasers would be entitled to possession of the property upon payment in full of the purchase price under the land contract, that a deed to the property would be delivered at that time, and that while the Dopps remained on the farm they would pay the taxes on the property and would be entitled to all rents and profits from the land and improvements until the contract price was paid in full. The contract also recited that the purchasers were satisfied with the title abstract submitted to them and any continuance of the abstract would be at cost of the purchasers. The offer was to be accepted by April 24, and if accepted the transaction was to be closed on or *139 before June 17. Also attached to the offer was Exhibit "A" consisting of a legal description of the property, and Exhibit "C" consisting of a 3-page addendum proposed on behalf of the Dopps by their attorney which in pertinent part provided the following: 1. It is agreed that the aforesaid offer to Purchase and the form of Land contract attached thereto is intended to be a modified exercise of that certain Option between these parties bearing a date of November 15, 1967 for the same land, and which Option ran to the first day of June, 1968, and that the provisions of such Option are to be incorporated in this agreement except insofar as they are expressly changed by the terms of the Offer to Purchase, the Land Contract and this instrument, or as they are inconsistent with these same documents. 2.The aforesaid Option dated November 15, 1967 has attached thereto an addendum with four numbered paragraphs, all of which are hereby eliminated as part of this agreement. 3. Gilbert R. Dopp and Beatrice W. Dopp, his wife, agree to furnish to the buyers a letter from the Federal Land Bank indicating the present balance due on the mortgage on the subject premises, which mortgage balance *140 may continue until the last payment under the Land Contract is made. 4. The provisions in the Option for payment for the survey and the topigraphical [sic] survey remain the same, and it is agreed that the survey cost is Five Hundered Thirty-five Dollars ($535.00) and that the difference of Two Hundred Sixty-five Dollars ($265.00) shall be paid to the sellers on the execution of the Land Contract. 5. The sellers will continue to cooperate and execute such documents as are necessary to have the premises annexed to the City of Oconomowoc. 6. The right created in the Option in the sellers to purchase a lot from the permises being sold shall continue as therein provided. 7. It is agreed that the right of the sellers as created in the Option to purchase a lot in Heritage Heights shall continue; that the notice required was given by the sellers, and that upon execution of the Land Contract this lot sale shall be closed, the lot shall be conveyed to the sellers and the sellers shall pay to the buyers the cost thereof as provided in said Option. 8. The provision in the Land Contract providing that the vendor agrees not to plant after October 1, 1968 is hereby removed. *141 9. On the execution of the Land Contract, there shall be credited on the first payment due, the payment of Two Hundred Fifty Dollars ($250.00) paid for the Option and the sum of One Hundred Dollars ($100.00) tendered with the Offer to Purchase. 10. During the term of the Land Contract, the sellers shall be under no obligation to keep up the buildings on the premises. 11. It is agreed that if the buyers wish to accelerate the payments under the Land Contract, that the sellers shall be entitled to 30 days notice thereof, and in addition thereto shall be entitled to 150 days notice to move from the house occupied by the sellers. The purpose of the notice on acceleration is to permit the sellers time to buy or build a new home, and if the full time shall not be required for this purpose, seller agrees to reduce this time. 12. Should the buyers exercise their Option to accelerate payments under the Land Contract, the following adjustments shall be made on closing, in addition to any other adjustments provided for in the related documents: (a) Taxes shall be pro-rated based on previous year's taxes (b) Rents shall be pro-rated for both the tenant house and the house occupied *142 by the sellers based on rental values set forth in the Option (c) If the farm land, during the year such acceleration is made, is subject to agricultural programs from which the seller will receive funds, the seller shall receive such funds for that calendar year, and the buyers agree that they will do nothing which would prevent the receipt thereof or require the repayment of funds previously received by sellers. (d) If the sellers have planted a crop, the buyers shall pay the cost of planting said crop as defined in the Option, plus the sum of Five Hundred Dollars ($500.00), after which such crop shall belong to the buyers. In May 1968, Rosen and Silberman met with the president of the First National Bank who referred them to its executive vice-president, Lee Melville (hereafter Melville). Melville prepared a memo dated May 8 which indicated that the bank would be willing to loan Highway 67, Inc., $165,000 to $170,000 to exercise the option on the Dopp farm, in return for a first mortgage on the property and a 3-year, 7 percent note guaranteed presonally by the three shareholders of the corporation. The memo stated that the bank valued the Dopp farm at $279,000. The loan *143 was never negotiated. Rosen and Silberman told Melville that the funds were not needed since Dopp had offered to sell the land pursuant to a land contract which required only a 10 percent downpayment. The Dopps accepted the offer, with Exhibits A through C incorporated therein, on May 28. On June 19, Rosen and Silberman, as purchasers, and the Dopps, as vendors, executed the land contract which in part recited: Additional Conditions: Those provisions contained in the Offer to Purchase and Acceptance of May 28, 1968, including Exhibit C, and the Option dated November 15, 1967, are a part of this agreement concerning upkeep of buildings, acceleration of payments, adjustments on acceleration and option to purchase a lot. The land contract was recorded in the Register of Deeds' office of Waukesha County on June 25. Ginsburg expressed an interest in joining with Rosen and Silberman in the purchase of the Dopp property but to insure that he would not be considered in the real estate business because of the purchase insisted that the property be acquired by a corporation. Since Ginsburg was able to finance the acquisition, Rosen and Silberman agreed with his wishes and therefore *144 formed Highway 67, Inc., to hold the property. On June 17, the corporation received the sum of $17,000 as a loan from Ginsburg.On June 19, Rosen and Silberman and their wives assigned their interests in the land contract to the corporation. These assignments were also promptly recorded in the Office of the Register of Deeds of Waukesha County. At the time Rosen and Silberman entered into the option agreement for the purchase of the Dopp farm they had no plan as to the use to be made of the land. They considered the land to have potential for use as residential development, for multi-family development, for commercial development, or for recreational development, or for a combination of these uses. At no time from the time of entering into the option agreement until after the execution of the land contract and the assignment of the contract to Highway 67, or at any time thereafter, did Rosen and Silberman have any plans for the use of the Dopp farmland in their own development business or any plan for the use of the property other than as an investment. On June 4, the city council of Oconomowoc adopted an ordinance approving the annexation of the Dopp farm. In accordance with *145 procedures routinely utilized by the city, the farm's initial zoning classification was R-1, which is the highest zoning classification of single family residences. In the same meeting, the council adopted an ordinance requiring that any developer of the annexed land refrain from submitting a preliminary plat for a 6-month period in order that the council might consider revision of its subdivision ordinance. The annexation of the Dopp farm to Oconomowoc caused city water and sewers to be available to the property. Oconomowoc is a community about 30 miles from Milwaukee. At the time Rosen and Silberman were negotiating for the Dopp property, there were a number of real estate developments in progress in the community. Property in the area was rapidly increasing in value. All these factors contributed to a rapid increase in value of the Dopp farm. At the time of the annexation proceeding and thereafter, it was general knowledge that Rosen and Silberman were interested in the Dopp farm. In addition, there was publicity in local papers about the annexation proceedings. As a result, several people contacted Rosen and Silberman to express an interest in acquiring parcels of the *146 property or to inquire as to their future plans for the property. Officials of the City of Oconomowoc also forwarded inquiries that they received with respect to the Dopp farm to Rosen and Silberman. Although Rosen and Silberman met with various people and listened to proposals for purchase and development of the parcel, they did not make any offer to sell any of the property or accept any offer made to them. The corporation held a meeting with regard to the land on June 20, during which the directors approved the actions of Rosen and Silberman as agents for the corporation in procuring the option and acquiring the Dopp farm pursuant to a land contract and the advancing of funds by Ginsburg for a downpayment thereon. The directors also authorized the proper officers to borrow $17,000 from and issue a promissory note to Ginsburg. Prior to July 17, the only acts done to or on the land consisted of soil tests carried out by a back hoe operator in areas of questionable soil conditions. These tests consisted of digging holes in which to observe the effects of ground water and from which to obtain sub-soil samples to be analyzed, after which the holes were filled up. Neither Rosen, *147 Silberman, nor Ginsburg nor Highway 67 ever advertised the property for sale or listed it for sale with a broker. Between July 17, 1968, and the end of that year no development of any kind was done to the property. No steps were taken toward any form of subdivision of the property. In 1968 Thomas Birdsall was a real estate broker and a licensed salesman for Louis Gral Investment Real Estate (hereinafter Gral Realty). Birdsall first became acquainted with Rosen in 1965 or 1966. Birdsall contacted Rosen from time to time, usually at Rosen's office, to inform him of various properties being held for sale. In August of 1968, Birdsall told Rosen in the presence of Ginsburg about some property available on Armour Road zoned for multi-family units. When Birdsall told Rosen the asking price, Rosen informed Birdsall that "if you think that's so good * * * we have something else up there," referring to the Dopp farm. Rosen described the location of the farm, but without specifying Dopp, and in response to Birdsall's inquiries told him that water and sewer were available almost to the property line. When asked by Birdsall if the land was available for sale Rosen replied it would be *148 if the price were right. Ginsburg or Rosen said they would take approximately $750,000 for the land. Birdsall said that he thought that price was high, but that he had some people with whom he had been working for about a year who might be interested. Rosen replied, "Fine." Several days later Birdsall personally viewed the property but did not speak to Dopp or Ruder, the tenant. Birdsall then secured additional information from governmental offices concerning the land and its topography and prepared a form with the heading "Operating Statement" indicating that the land was being offered for sale at a price of $750,000, with $550,000 financing available. Also, based on information he had secured on his own, the statement included the following remarks: Excellent commercial, multi-family, residential zoning. With land, new owner will receive commitments from bank, major motel, oil company. Sewer & water at property line. Last acreage that will be annexed to Oconomowoc, less than one mile from I-94 interchange. Highly successful projects surrounding the land. New #67 & #16 interchange directly to north will have traffic passing directly in front, shopping center possibilities, *149 etc. This statement was not shown to anyone connected with Highway 67 and no one connected with that corporation was aware that Birdsall was using such a statement. Birdsall presented the statement to James Hauer of Professional Management of Milwaukee, Inc. (hereinafter Professional) and met several times with him to attempt to interest his company in acquiring the Dopp farm. Professional investigated the possibilities of obtaining the zoning it needed for planned multiple-family residential, commercial, and recreational uses. Professional then told Birdsall that they were interested and directed him to prepare an offer. On September 28, Professional offered to buy the Dopp farm for $725,000, subject to extensive conditions listed on an attached rider. The offer provided for payment of earnest money of $25,000, with an additional payment of $15,000 upon acceptance and the balance as provided in the rider. The offer required acceptance by October 2. The printed "offer to purchase" form was filled in by Birdsall, but the two-page typed rider had been prepared in Hauer's office and at his direction. The rider recited that it was conditioned on buyer or Gral Realty for *150 buyer obtaining among other things (1) written binding commitments for purchase of parts of the land by a major motel chain, a savings and loan association, and a major oil company; (2) approval within 4 months by the city of Oconomowoc of a zoning mix to include commercial, multiple family, and single family residences; (3) acceptable soil tests; and (4) adequate city sewer and water. The rider provided for payment of another $160,000 at closing, with the balance to be paid over 3 years with interest at 4 percent and secured by a first mortgage to be subordinated to financing for improvements. The rider further provided for release from the mortgage of various parcels of land upon payment of specified amounts. Closing was set for 30 days after final zoning approval and satisfaction of all commitments and contingencies. The stockholders of Professional were personally to guarantee the contract. Upon receipt of the offer, Rosen executed an "Addendum" dated October 7 which amounted to a counter-offer and which proposed changes in the conditions set forth in the rider to the offer, as follows: (1) All contingencies are to be satisfied within 6 months or the contract is null and *151 void; (2) the commitment for the motel was limited to land acquisition, deleting a construction requirement; the commitment from a savings and loan association was stricken; the commitment from the major oil company deleted any reference to required location; (3) in the zoning mix contingency, the required commercial area was cut in half and the multiple family area from about 34 acres to 20 acres; (4) the contingency concerning soil conditions was limited in time; (5) the adequacy of water and sewer services was to be in reliance on the annexation arrangements; (6) the financing of the unpaid $525,000 balance was changed to a personal note, guaranteed by a bank, with interest at 6-1/2 percent per annum, with regular payout provisions; (7) the subordination to other financing was stricken; (8) closing was to be within 6 months of acceptance; (9) other terms were to remain; and (10) the addendum was to be accepted by October 17. The acceptance date was subsequently extended by Rosen to October 21. The offer and addendum of September 28 and October 17 were not accepted. Instead, on October 24 Birdsall relayed a new offer to Rosen from Professional which provided *152 for acceptance on or before October 28 and for closing by December 27. The new offer called for a price of $505,000 with $25,000 paid down as earnest money and an additional payment in cash of $15,000 upon acceptance, with the balance of $465,000 to be paid in cash at time of closing. The offer further required the seller to cooperate in the execution of any documents necessary for proper zoning, sewer and water, and street requirements and also contained a covenant by the seller agreeing not to build a motel or shopping center within 4 miles of the subject property within 12 months. The offer was changed by an addendum dated October 30, amounting to a counter-offer, providing for a purchase price of $550,000, of which $275,000 would be paid at closing and the remaining $275,000 by May 15, 1969. The offer with the addendum attached was accepted by Professional on November 2. A verbal agreement had been reached between Rosen on behalf of Highway 67, Inc., and Birdsall whereby the corporation would pay Birdsall a commission if Professional bought the farm. This understanding was the basis for a subsequent written agreement entered into on October 23, 1968, providing for a commission *153 of $50,000 to be paid to Gral Realty if the Dopp farm were sold to Professional for $550,000. On October 29, 1968, the stockholders of the corporation adopted a plan of dissolution pursuant to section 337, authorizing the dissolution of the corporation by September 30, 1969, and the filing and recording of a Statement of Intent to Dissolve, as well as execution of all other necessary documents and final distribution of all remaining assets pro rata to its stockholders. On November 13, Highway 67, Inc., sent two letters to the Dopps which notified them of the assignment of the purchasers' interest in the land contract to the corporation on June 19, 1968, and the acceleration of payment of the balance of the land contract to December 20, as well as giving them the required notice to vacate the premises. The first corporate income tax return filed by Highway 67 on November 14, 1968, for the period May 13, 1968, through July 31, 1968, disclosed receipt of no income and reported a small operating loss resulting from office expenses incurred. The balance sheet as of July 31, attached to the return, listed the corporation's sole asset other than $613.91 in cash and a loan receivable *154 of $306 as "Land" costing $167,038, and its sole liability as "Mtges., notes, bonds payable in 1 yr. or more" in the amount of $167,000. On the return the principal business activity of the corporation was stated to be "Real Estate Investments." On November 19, the corporation received the sum of $5,000 as a loan from First National Bank. On November 29, Ginsburg and Rosen, as officers of the corporation, executed a Statement of Intent to Dissolve the corporation which was filed with the Secretary of State of Wisconsin on December 3 and recorded on December 5. On December 19, the Dopps executed a warranty deed to the corporation which stated: This deed is executed and delivered in satisfaction of that Land Contract dated June 19, 1968, between the grantors and Michael D. Rosen and Theodore Silberman. The deed was recorded in the office of the Register of Deeds of Waukesha County on the following day. Also on December 19, the Dopps and Rosen signed a document entitled "Closing Statement on Sale of Real Estate" which showed a $148,488.60 balance due to the Dopps on the contract after adjustments made with respect to rent from the Ruders and 1967 taxes. This document directed *155 that the deed to the property be made to Highway 67 and further provided that: It is agreed that seller may have until 2/1/69 to remove his corn. The right of the sellers to purchase a lot when and if this farm is platted as described in the contracts preceding this closing, survives this closing. At the bottom of the closing statement was the following phrase: We, the undersigned, hereby agree that the above statement is correct as agreed upon this date and is a final settlement of all moneys due upon the foregoing sale. Also, on December 19, the corporation borrowed $150,000 from First National Bank. In satisfaction of the balance due on the land contract, the corporation then paid $6,481.55 to the Dopps' mortgagee to retire their still outstanding indebtedness on the land and the remaining $142,007.05 to the Dopps. On December 20, the stockholders of Highway 67, Inc., approved the sale of the Dopp farm to Professional Investors Syndicate (hereinafter Investors), an assignee of Professional. The stockholders also authorized distribution to themselves of the excess of the amount to be received from Investors as the first installment on the sale of the land over *156 the amount required to fulfill the land contract and other corporate expenses. On December 30, the corporation delivered to Investors a warranty deed with respect to the Dopp farm which was recorded in the county office of the Register of Deeds on January 2, 1969. On December 30, 1968, Investors and Highway 67, Inc., signed a "Statement for Real Estate Closing" with respect to the Dopp farm which stated the sales price of $550,000 due the corporation, adjustment of the sales price by tax and rent credits, the amount of the downpayment, the amount of $232,825.14 due on the date of closing, and the balance of $275,000 due on May 15, 1969. On the same day, the corporation paid Gral Realty $25,000 as commission and signed an agreement to pay the remaining $25,000 on or before May 15, 1969. On December 31, 1968, the corporation repaid loans to First National Bank in the amount of $155,000 and to Ginsburg in the amount of $17,000. On the same day, the corporation issued its checks payable to the following persons in the indicated amounts: Ginsburg
$29,200
Silberman
14,600
Rosen
29,127
Marcuvitz
73
On February 28, 1969, Investors paid $275,000 to the *157 corporation as payment of the balance of the purchase price for the Dopp farm. On March 27, 1969, the corporation issued its checks to the following persons in the indicated amounts: Ginsburg
$100,000
Silberman
50,000
Rosen
100,000
On that day also, the corporation paid $25,000 to Gral Realty. On May 15, 1969, Ginsburg and Rosen, as officers of Highway 67, executed Articles of Dissolution which were filed with the Secretary of State on May 19 and recorded on May 26, 1969. On October 22, 1969, the corporation issued checks to the following persons in the amounts indicated: Ginsburg
$262.72
Silberman
131.35
Rosen
262.72
For the year 1969, the corporation reported on forms 1099 payments to the following persons in the amounts indicated: Ginsburg
$100,262.72
Silberman
50,131.35
Rosen
100,012.06
Marcuvitz
250.66
The corporation's final Federal income tax return on form 1120 for its period August 1, 1968 to May 26, 1969, reported no gain from the sale of the land and recited the following: This corporation was completely liquidated under Section 337, IRC 1954 pursuant to a plan of liquidation adopted October 29, 1968. *158 Assets sold - land 12/30/68
$550,000.00
Cost of Land Sold 220,961.40
Sec. 337 Surplus $329,038.60
The final liquidating dividend was distributed May 26, 1969. No assets were retained. Respondent attached to his notice of liability to each Rosen, Silberman, and Ginsberg a computation showing a deficiency in income tax of Highway 67 for the "taxable year ended" May 26, 1969, of $165,284.34 on the basis of increasing the loss of $6,339.72 reported on the corporate return by $332,962 stated to be "gain from sale of land." Respondent explained his determination as follows: It is determined that Highway 67 Development, Inc. is a collapsible corporation as defined in section 341 of the Internal Revenue Code. Accordingly the gain of $332,962.00 realized from the sale of land which was not recognized by the corporation under section 337 of Code is considered as a gain from the sale or exchange of property which is not a capital asset * * * On November 8, 1967, Rosen purchased 2,000 shares of Antoine Silver Mines, Ltd., stock (hereinafter Antoine Mines). On December 21, he purchased 1,000 additional shares, and on March 29, 1968, he purchased *159 another 2,000 shares at the respective costs of $3,732.25, $1,764.25, and $4,905. Rosen understood at the time he purchased the stock that it was listed for trading in the United States, but within about 3 months after his last purchase he "found out" that the Securities & Exchange Commission (SEC) had suspended trading of the stock in the United States. He did not know whether the stock was still being traded in Canada on any market. At the time Rosen's accountant was preparing Rosen's Federal income tax return for the calendar year 1969 the accountant asked Rosen for substantiation of the item of worthlessness of the Antoine Mines stock. Rosen then contacted the brokerage firms of Loewi & Company in Milwaukee and Reynolds & Co. in Chicago to inquire whether there was a market for the Antoine Mines stock as of December 31, 1969, and received a letter from each of the firms stating that the firm had found no market for the stock. He attached the two letters to his 1969 income tax return. Later Rosen called the two brokerage houses to ask if they could find a buyer for the stock and was informed that they could not. Next Rosen wrote to the Bureau of Mines in Canada for information *160 as to the company and was told that it was still registered. He then called a securities dealer in Vancouver, B.C., to ascertain if there was a market for the stock and was informed that the company was still listed but was inactive and there was no market for the stock. Rosen did not know whether Antoine Mines had any assets at the end of 1969 or whether the stock was traded in Canada as of that time. The Vancouver Province and the Financial Post are newspapers of general circulation published in Canada. In the years 1968 through 1972, the Vancouver Province contained a financial section which listed prices bid and asked for securities. The Vancouver Province printed bid and asked prices for a stock listed as Antoine, or Antoine Silver, shown through July 2, 1969, as traded over the counter and thereafter carried under the heading "Vancouver unlisted" at the following prices on the following dates: Date
Bid
Ask December 21, 1968
.28
.40
June 28, 1969
.24
.30
July 2, 1969
.24
December 31, 1969
.08
.13
June 30, 1970
.08
.12
December 30, 1970
.08
.12
June 30, 1971
.02
.06
December 31, 1971
.02
.05
April 11, 1972
Susp.
The *161 Financial Post publishes an annual Survey of Mines for the information of the business and financial community of Canada. In its annual Survey of Mines for the year 1972, the Antoine Silver Mines, Ltd., was shown as having, "according to last reports received," silver-lead-zinc prospects and also gold prospects held by a wholly-owned subsidiary.The survey showed the company as having authorized capital of 5,000,000 shares with 50 cents par value. In their 1969 joint Federal income tax return for the taxable year 1969, the Rosens reported as a capital loss the total $10,401.50 cost of their Antoine Mines stock with the notation "no market" in place of a gross sales price. Respondent disallowed this claimed loss with the explanation that it had not been established that the stock became worthless in 1969. ULTIMATE FINDINGS OF FACT In December 1968, Highway 67 did not hold the Dopp farm primarily for sale to customers in the ordinary course of its business. The record does not show that the stock of Antoine Mines became totally worthless in 1969. OPINION Section 337(a)[4] provides that if a corporation adopts a plan of complete liquidation, and within the 12-month *162 period beginning on the date of the adoption of that plan all of the assets of the corporation are distributed in complete liquidation, no gain or loss shall be recognized to the corporation from the sale or exchange by it of property within such 12-month period. It is petitioners' position that all of the criteria required in section 337 were met in the liquidation of Highway 67, and therefore Highway 67 is not required at the corporate level to recognize any gain from the sale of the Dopp farm. Respondent, on the other hand, takes the position that the provisions of section 337(c)[5] that the section does not apply to any sale or exchange *163 made by a collapsible corporation as defined in section 341(b), prohibit the application of section 337(a) to the sale of the Dopp farm by Highway 67. Section 341(b), [6] insofar as here pertinent, defines a collapsible corporation to mean a corporation formed or availed of for the purchase of property described in section 341(b) (3) with a view to a liquidating distribution to its shareholders before the realization by the corporation purchasing the property of a substantial part of the taxable income to be derived from such property. Section 341(b) (3), insofar as here pertinent, defines property to which section 341 is applicable to mean property held for a period of less than 3 years, which is property held by the corporation primarily for sale to customers in the ordinary course of its trade or business.
*164 It is petitioners' position that the Dopp farm was held by Highway 67 as an investment and that it was not property held by Highway 67 primarily for sale to customers in the ordinary course of the trade or business of Highway 67. Petitioners contend that the only purpose for the formation of, and the only purpose served by, Highway 67 was to hold a piece of investment property and that clearly Highway 67 was not in the trade or business of selling property. [7]
*165 Petitioners rely on our opinion in William B. Howell, 57 T.C. 546 (1972), and the case of Morris Cohen, 39 T.C. 886 (1963), which was cited in the Howell case, for the proposition that the fact that a corporation has as its sole activity an investment activity does not necessarily cause that activity to be the trade or business of that corporation so that a single piece of property held as an investment and sold by the corporation must necessarily be property held primarily for sale by the corporation in the ordinary course of the trade or business of that corporation. We agree with petitioners that this is the holding in the case of William B. Howell, supra. In that case we stated at 553: Preliminarily, we point out that respondent has not questioned the validity of the corporation structure. Rather, both parties agree that Hectare was a viable corporation. Such an understanding is appropriate in light of the Supreme Court's determination in Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943).
As we understand the principal thrust of respondent's present position it is that, since the holding and subsequent sale *166 of the real property was the only activity engaged in by Hectare, such sole activity must have resulted in the receipt of ordinary income. Or to state the proposition in the negative, a corporation cannot have as its sole activity an investment activity which qualifies its only income as capital gain even though in another setting this same income might be so treated. We cannot accept this contention. There is nothing unique or improper about a corporation engaging in exclusively investment activity. We can find no basis in the Code, the regulations thereunder, the decided cases, or the generally accepted concepts of tax law for requiring that every corporation must have some "ordinary income" activity. Further, we find no need here to ignore the recognized precepts of corporate law, with respect to corporate viability, to maintain the integrity of the Internal Revenue Code. Even though we were there discussing the receipt of ordinary income as compared to receipt which constituted a capital gain, inherent in our holding was that a corporation can hold property for investment and sell that property without necessarily being in the trade or business of the sale of property. *167 In fact, this is completely clear from our further holding in the Howell case. After concluding that a corporation may hold as its only property investment assets, we stated that we must then proceed to an analysis of whether the real property which was held and sold by the corporation involved in the Howell case was held by that corporation primarily for sale to customers in the ordinary course of the trade or business of the corporation or for investment purposes. We pointed out that this determination involved a fact question, and after reciting some of the recognized tests for making this determination, we concluded that the corporation there involved "was engaged solely in investment activities in acquiring and selling the real estate." While the issue in the Howell case involved whether the property sold by the Hectare Corporation was property held for sale in the ordinary course of the corporate trade or business within the meaning of section 1221(1) [8] neither party suggests that the words, "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," as used in section 1221(1) have any different meaning from those identical words *168 as used in section 341(b) (3) (B).In fact, the case which respondent primarily relies on to support his position, Guy A. Van Heusden, 44 T.C. 491 (1965), aff'd. 369 F.2d 119 (C.A. 5, 1966), referred to the various criteria which have been used to determine the fact question of whether property was held for sale to customers in the ordinary course of a taxpayer's trade or business under section 1221(1) as a background for its conclusion that the corporation there involved "was not holding the property primarily as an investment." In this respect we stated in the Van Heusden case at 498: Various criteria have been judicially developed to determine whether property is held primarily for sale to customers in the ordinary course of business, but as one court has stated, "each case must in the end stand on its own bottom and must be decided on its own peculiar facts." Murray v. Commissioner, 238 F.2d 137, 138 (C.A. 10, 1956). Without reciting the various criteria (see, e.g., D. L. Phillips, 24 T.C. 435 (1955); Maudlin v. Commissioner, 195 F.2d 714 (C.A. 10, 1952); Pool v. Commissioner, 251 F.2d 233 (C.A. 9, *169 1957)), we conclude that the corporation was not holding the property primarily as an investment. * * * From the facts we have set forth and based on the criteria generally used to determine whether property is held by a corporation primarily for sale to customers in the corporate trade or business, we conclude and have found as a fact that Highway 67 was not holding the Dopp farm for sale to customers in the ordinary course of its trade or business.As we pointed out in Robert W. Pointer, 48 T.C. 906, 915 (1967), aff'd. 419 F.2d 213 (C.A. 9, 1969), the factual issue of whether property is held by a corporation primarily for sale to customers in the *170 ordinary course of the corporation's trade or business is to be determined from an objective rather than subjective approach, considering such factors as the purpose for which the asset was acquired, the frequency, continuity and size of the sales, the activity of the seller or those acting for the seller in the improvement and the disposition of the property, the extent of the improvements made to the property sold, the proximity of sales to purchases, and the purpose for which the property was held during the taxable years. This record shows that the Dopp farm was acquired as an investment asset, that Highway 67 made no sale of any property other than the Dopp farm, that no improvements were made to the farm, and no effort was made to sell the farm, but rather it was sold because of one of the officers of the company being approached by a broker who had a customer. [9]
*171 The only factor in any way tending to support respondent's position that the Dopp farm was held by Highway 67 for sale to customers in the ordinary course of a trade or business is the proximity of the sale of the property to its purchase. Respondent, in effect, recognizes this and attempts from this fact alone, and his interpretation of our holding in the Van Heusden case to have us conclude that it necessarily follows that the sale of this property by Highway 67 was a sale in the ordinary course of the trade or business of that corporation. Respondent is, in effect, rearguing that which he unsuccessfully argued in the Howell case, that where the only activity of a corporation is the purchase and sale of one piece of property, that purchase and sale must necessarily cause the corporation to be in the trade or business of purchasing property for resale to customers. In fact respondent quotes and heavily relies on the following statement in Guy A. Van Heusden, supra, at 498-499: Whatever petitioner's original purpose may have been in acquiring the property, [footnote omitted] its character in the hands of the corporation can hardly be described as an investment. *172 Since the corporation's only trade or business was to deal with this property, the El Pico tract was a "section 341 asset" within the meaning of section 341(b) (3) (B). In view of our holding in the Howell case, respondent's interpretation of this statement as meaning that where a corporation's only activity is the purchase and resale of a piece of property, it is necessarily engaged in the trade or business of selling such property to customers and the sale is made in the ordinary course of such trade or business, is unacceptable. Rather, the statement in the Van Heusden case in the light of our holding in the Howell case must be interpreted to mean that under the facts in that case the corporation there involved was engaged in the trade or business of selling real property to its customers. On the facts in the instant case, we have concluded that Highway 67 was not engaged in the trade or business of selling undeveloped property to customers. In arriving at this conclusion we have not overlooked the fact that the sale of the Dopp farm was made only approximately 6-1/2 months after Highway 67 acquired any interest in that property and less than 2 weeks after Highway 67 received *173 a deed to the property. However, based on the facts here present, which show that the sale was a result of an unexpected fortuitous circumstance which was that a broker who happened to know Rosen had a customer who had been looking for approximately a year for a piece of property located in the area where the Dopp farm was located and who was very anxious to acquire property which might be subject to multiple use zoning, the proximity of the sale to the acquisition ceases to have any real meaning. In Morris Cohen, supra, a case with facts very comparable to those in the instant case, except that the stockholders sold their stock in the corporation instead of the corporation selling the real property and liquidating, we held that the corporation there involved was not a collapsible corporation since it was not in the trade or business of selling real estate. In the Morris Cohen case the stockholders sold their stock in the corporation to persons who wanted the land which the corporation held under a purchase contract about 8 months after the corporation was formed and entered into the agreement to purchase the land. We placed little weight on the proximity of the sale *174 of the stock to its purchase, explaining (39 T.C. at 892), that "the early sale at a profit of the DOM stock was made possible by the selection of nearby land for the location of two large manufacturing plants, a fortunate circumstance not anticipated by the petitioners." As we pointed out in George W. Mitchell, 47 T.C. 120, 126 (1966), under certain factual circumstances, even if a taxpayer acquires property with an intention to resell it immediately, that intent alone would not put the taxpayer in the real estate business. In so holding we relied on our prior holding in Wellesley A. Ayling, 32 T.C. 704, 708 (1959), in which we pointed out that the fact that a taxpayer purchased property with the idea of disposing of it in the most expeditious manner possible was not controlling of whether that taxpayer was in the trade or business of selling real estate and held that property for sale to customers in the ordinary course of such a trade or business. Of course, in the broad sense of the word, even a fortuitous sale made under the circumstances here present is a sale to a customer since in that broad sense any sale is to a customer, but this *175 does not mean the seller is necessarily in the trade or business of selling property.In fact, the United States Court of Appeals for the Seventh Circuit, to which circuit an appeal in this case would lie, in Scheuber v. Commissioner, 371 F.2d 996, 999 (C.A. 7, 1967), reversing a Memorandum Opinion of this Court, considered "unrealistically high" returns on property to be a strong indication that such property was not held by the taxpayer "for resale in day-to-day operation of a business." As we pointed out in the Howell case at 555, "though the property may have been acquired with the ultimate intention of reselling, this does not result in a determination that the property was held primarily for sale in the ordinary course of business." We further there pointed out that the fact that the property is held primarily for sale is not sufficient to meet the statutory requirement since the property must also be held for sale in the ordinary course of business. Where, as in Howell and the instant case, the corporation had no ordinary business but was engaged solely in holding investment property until a good sales opportuniy arose, the facts are such that the sale is not one *176 in the ordinary course of business. It might be noted that respondent makes no real effort to distinguish the Howell case from the instant case other than to say that in that case this Court held as a fact that the property sold by the corporation was not held primarily for sale to customers in the ordinary course of business. Respondent's chief argument in the instant case is that under Wisconsin law, Highway 67 did not, by the land contract dated June 19, 1968, which was assigned to it, "purchase" the Dopp farm property, but rather it "purchased" that property only at the time it received legal title under the warranty deed issued to it by the Dopps on December 19, 1968. Respondent then states that since arrangements had been made to sell the property to Professional prior to the time it "purchased" the property on December 19, 1968, it necessarily follows that it held the property during the entire time that it owned the property for sale to customers. Again, respondent relies on the Van Heusden case in support of this position. For the same reason we set forth above in distinguishing the Van Heusden case from the Howell case, we do not agree with respondent's position. If *177 the issue here were whether any gain by the corporation on the sale of the property was longterm capital gain or short-term capital gain, there might be merit to the extended argument made by respondent as to the date when the sale of the property to Highway 67 occurred. Even then the niceties of State law would not be controlling but rather whether on June 19, 1968, the corporation had sufficient dominion and control over the property to be considered to own the property. As we pointed out in Pacific Coast Music Jobbers, Inc., 55 T.C. 866, 874 (1971), aff'd. 457 F.2d 1165 (C.A. 5, 1972), for the purpose of Federal income taxation the determination of whether a sale has occurred centers on which party has command or dominion over the property. A court must consider not only when the bare legal title passed but also when the benefits of the property and the burdens were acquired or disposed of in a closed transaction. However, in the instant case, we are not concerned with whether any gain that Highway 67 may have had from the sale of the Dopp farm was "short-term capital gain" from the sale or exchange of a capital asset held for not more than 6 months *178 within the meaning of section 1222(1) or "long-term capital gain" from the sale or exchange of a capital asset held for more than 6 months. If the Dopp farm in the hands of Highway 67 was a capital asset because it was property held by Highway 67, which was not held by that corporation "primarily for sale to customers in the ordinary course of [its] trade or business," then the Dopp farm, regardless of when it was purchased, was not property in the hands of Highway 67 described in paragraph 341(b) (3) (B) since that paragraph would include such property only if it were "held by the corporation primarily for sale to customers in the ordinary course of its trade or business." Since we have concluded that the only activity of Highway 67 was to hold property for investment and that under our holding property so held, even though that property is held for sale and sold, to be "held for sale to customers in the ordinary course of its trade or business," we conclude that Highway 67 was not a collapsible corporation within the meaning of section 341(b), and therefore it is entitled not to recognize the gain to it from the sale of the Dopp farm under the provisions of section 337(a). *179 Since we have decided that Highway 67 has no deficiency in its income tax liability for its taxable period August 1, 1968, through May 26, 1969, there is no amount due from Rosen, Silberman, and Ginsburg as transferees of that corporation and therefore their alternative contention in the cases involving their own income tax liabilities for 1968 and 1969 is moot. The only issue remaining for decision is whether petitioners Michael and Gail Rosen are entitled to a capital loss under section 165(g), [10] from worthlessness of 5,000 shares of stock in Antoine Mines. Whether stock of a corporation is worthless and, if so, the year in which it became worthless are questions of fact, to be determined from consideration *180 of all evidence presented. Boehm v. Commissioner, 326 U.S. 287 (1945); Joseph C. Lincoln, 24 T.C. 669, 694 (1955). Petitioners must prove that their mining stock had lost all value in order to be entitled to a deduction for worthless stock. The mere shrinkage in value of stock retained by a taxpayer is not sufficient to cause any portion of the decrease in value to be deductible. W. P. Davis, 6 B.T.A. 1267 (1927). Usually, stock in a going concern is not considered to be worthless unless it is established that the stock has no current liquidating value as well as no potential value. Joseph C. Lincoln, supra; Sterling Morton, 38 B.T.A. 1270 (1938), affirmed 112 F.2d 320 (C.A. 7, 1940). In Morton, we stated at 1278: The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. *181 If its assets are less than its liabilities but there is reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. There is no evidence of any such identifiable event in the record before us. There is no evidence that the company was insolvent. The evidence indicates that the company had not been liquidated. There is no evidence that the company did not have valuable assets. Petitioners sought to establish the worthlessness of their Antoine Mines stock by showing that the stock was not being sold in the United States because of a ban by SEC on trading of the stock and that an inquiry by Rosen to one securities dealer in British Columbia, Canada had brought the response that although the company was still registered there was no market for the stock. Petitioners object to the evidence produced by respondent through a deposition *182 taken on written interrogatories showing listing of the Antoine Mines stock throughout the years 1968 through 1971. While this evidence is not strong it has some probative value on the issue of whether the stock became worthless in 1969. However, even if we gave no weight to this evidence or refused to admit it into the record, we would still conclude that petitioner has failed to show that the Antoine Mines stock became worthless in 1969. Rosen testified that he did not know what assets the company had in 1969 or the value of those assets. The fact that the stock had no ready market does not establish that it had become worthless. Stevens Bros. Foundation, Inc., 39 T.C. 93, 124 (1962). Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Michael Rosen, Docket No. 5694-72; Sam Ginsburg, Docket No. 5695-72; Theodore Silberman, Docket No. 5696-72; Theodore Silberman and Dorothy Silberman, Docket No. 5697-72; and Michael Rosen and Gail Rosen, Docket No. 5698-72. ↩
2. All references are to the Internal Revenue Code of 1954. ↩
3. On March 8, 1968, Gilbert Dopp did apply to ASCS for participation in the feed, grain, and wheat program for that year. ↩
4. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. ↩
5. Sec. 337(c) Limitations. - (1) Collapsible corporations and liquidations to which section 333 applies. - This section shall not apply to any sale or exchange - (A) made by a collapsible corporation (as defined in section 341(b)), or ***↩
6. Section 341(b) Definitions. - (1) Collapsible corporation. - For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to - (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. (2) Production or purchase of property. - For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced or purchased property, if - (A) it engaged in the manufacture, construction, or production of such property to any extent, (B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or (C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation. (3) Section 341 assets. - For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is - (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year; (B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business; (C) unrealized receivables or fees, except receivables from sales of property other than property described in this paragraph; or (D) property described in section 1231(b) (without regard to any holding period therein provided), except such property which is or has been used in connection with the manufacture, construction, production, or sale of property described in subparagraph (A) or (B). In determining whether the 3-year holding period specified in this paragraph has been satisfied, section 1223 shall apply, but no such period shall be deemed to begin before the completion of the manufacture, construction, production, or purchase. (4) Unrealized receivables. - For purposes of paragraph (3) (C), the term "unrealized receivables or fees" means, to the extent not previously includible in income under the method of accounting used by the corporation, any rights (contractual or otherwise) to payment for - (A) goods delivered, or to be delivered, to the extent the proceeds therefrom would be treated as amounts received from the sale or exchange of property other than a capital asset, or (B) services rendered or to be rendered. ↩
7. Although respondent initially determined in the case of the individual taxpayers that in the event it was held that Highway 67 was not a collapsible corporation, it was then "determined that the corporation's election to terminate its subchapter S status is invalid and that the shares of income realized by each of the shareholders of Highway 67 was ordinary income," he abandoned this position at the trial and has not raised it on brief. Apparently, from the statement at the trial, respondent has conceded that the election to be taxed as a subchapter S corporation by Highway 67 was terminated when a new stockholder came into that corporation in August 1968 and did not file a consent to the election. In any event, as the facts set forth in our findings show, such is the situation. It is also to be noted that respondent has not contended that section 337(a) is not applicable to the property sold by Highway 67 because of the provisions of section 337(b) that for the purposes of section 337(a), the term "property" does not include "property held by the corporation primarily for sale to customers in the ordinary course of its trade or business." Although no comment is made in this regard by respondent, apparently he would consider the exceptions to this provision contained in section 337(b) (2) that such provision is inapplicable if substantially all of the property described in section 337(b) (1) which is attributable to a trade or business of a corporation is sold or exchanged to one person in one transaction. Jeanese, Inc. v. United States, 341 F.2d 502↩ (C.A. 9, 1965), applied this provision to the sale of a subdivided section by a liquidating corporation admittedly engaged in the trade or business of selling the subdivided lots to its customers. 8. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * ↩
9. Respondent makes no contention that any trade or business of the officers of Highway 67 should be imputed to the corporation. However, as we have pointed out in our findings of fact, none of the officers or stockholders of Highway 67 was engaged in buying unimproved land for resale to customers in a trade or business although two of them had been for sometime actively engaged in various forms of the real estate business, and Ginsburg, the other corporate officer and stockholder, became involved in a real estate development partnership about the same time that he became a stockholder in Highway 67. ↩
10. SEC. 165. LOSSES. * * * (g) Worthless Securities. - (1) General rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; * * * ↩